UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BUFFALO NAVAL PARK COMMITTEE INC.,

Plaintiff,

-against-

WATER QUALITY INSURANCE SYNDICATE,

Defendant.

Case No. 1:25-cv-06344 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

USS *The Sullivans* is a decommissioned World War II vessel docked in the Buffalo

River in Buffalo, New York, where Plaintiff Buffalo Naval Park Committee Inc. ("Plaintiff"

or "BNP") maintains it as a fixed naval museum. Dkt. 1 ("Compl.") ¶¶ 1, 16. In or around

April 14, 2022, BNP discovered that *The Sullivans* had taken on water and, as a result, was

partially submerged; after attempting to pump water from it, BNP noticed that *The Sullivans*

had leaked oil into the water. Compl. ¶ 18.

At the time of the oil spill, *The Sullivans* was insured under a policy sold to BNP (the

"Policy") by Defendant Water Quality Insurance Syndicate ("Defendant" or "WQIS").

Compl. ¶ 61; *see* Dkt. 13 ("WQIS Br.") at 2. Among other things, the Policy provides that

WQIS will indemnify BNP for any costs the latter "shall have paid for pollution response or

damages . . . in its capacity as Owner and/or Operator of [*The Sullivans*]," including where

that pollution violates certain federal environmental laws or where those costs "aris[e] out [of]

the sudden, accidental and unintentional discharge . . . of any substance of any kind into or

upon the Navigable Waters, the adjoining shorelines or the Exclusive Economic Zone."

Dkt. 1-2 at 4. The Policy also contains a forum-selection clause, providing that BNP will

bring "any lawsuit or other legal action" against WQIS for "any dispute arising out of or in

any way concerning this Policy or the coverage provided . . . [t]hereunder . . . in the United States District Court for the Southern District of New York."  Dkt. 1-2 at 9.

On July 31, 2025, BNP initiated this action, asserting three claims against WQIS, all concerning the extent of WQIS's obligation under the Policy to reimburse BNP for costs it incurred in remediating the oil spill.  Compl. ¶¶ 68-84.  Having filed the action in this Court, BNP now finds itself in the unique position of arguing that this Court has no jurisdiction to hear it.  Indeed, BNP alleges that the action involves no federal question and that the parties are not diverse.  Compl. ¶ 8.  But, BNP explains, it was constrained to sue in this Court because the New York State Supreme Court, County of Erie, dismissed its previously filed state-level action in October 2023, holding that a forum-selection clause in the Policy "ma[de] clear that the parties agreed to resolve their disputes" in this Court.  Dkt. 7 at 2 (quoting Dkt. 7-1 at 1).  The New York Appellate Division, Fourth Department, affirmed that dismissal.  Dkt. 7-2 at 2.

The Court requested briefing from the parties to address (1) whether this case falls within the Court's admiralty or maritime jurisdiction and (2) the legal effect of the parties' forum-selection clause.  *See* Dkt. 8; Dkt. 12 ("BNP Br."); WQIS Br.; Dkt. 14 ("WQIS Reply"); Dkt. 15 ("BNP Reply").  For the reasons explained below, the Court finds that it has maritime jurisdiction to hear the matter and that the Southern District of New York is the proper venue based on the parties' forum-selection clause.

## DISCUSSION

### I.  Maritime Jurisdiction

This Court has "original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction."  28 U.S.C. § 1333(1).  Nautical though that grant may seem, it also "provides for jurisdiction over claims arising from maritime

contracts." *d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.*, 886 F.3d 216, 223 (2d Cir. 2018) (citing *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 632 (2d Cir. 2016)).  The Supreme Court has long understood maritime contracts expansively, such that they include not just those "made upon the sea and to be executed thereon," but rather all those whose "*subject-matter* . . . [i]s maritime."  *New Eng. Mut. Marine Ins. Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 26, 29 (1870).  Accordingly, courts must look to "the nature and character of the contract" at issue, particularly "whether it has 'reference to maritime service or maritime transactions,'" in determining whether it is maritime.  *Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 24 (2004) (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)); *see d'Amico*, 886 F.3d at 226 ("[T]he north star for maritime contract jurisdiction is an agreement's relationship with maritime commerce, not its tie to any particular vessel (or seaman, or shipment).").  Ultimately, the heart of maritime jurisdiction is "the protection of maritime *commerce*."  *Kirby*, 543 U.S. at 25 (quoting *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 608 (1991)).

The question for the Court here, then, is whether the Policy is a maritime contract.  In the past, Second Circuit precedent required a two-step inquiry to assess this question.  First, the Court would conduct a "threshold" inquiry into the "subject matter of the dispute," to determine whether it is "so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction."  *In re Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 74 (2d. Cir. 1996) (quoting *Atl. Mut. Ins. Co. v. Balfour MacLaine Int'l Ltd.*, 968 F.2d 196, 200 (2d. Cir. 1992)).  Second, the Court would look to the subject matter of the contract to "categorize contractual rights as maritime or non-maritime."  *Atl. Mut.*, 968 F.2d at 199.  However, when the Supreme Court decided *Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd* in 2004, it focused solely on the subject matter of the contract,

omitting "any discussion . . . of a 'threshold inquiry' akin to that found in [Second Circuit] precedents." *Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 314 (2d Cir. 2005). In *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*, decided the next year, the Second Circuit found that omission "notable" and expressed "some uncertainty" as to whether and to what extent the threshold inquiry survived *Kirby. Id.* at 313- 14. However, because *Kirby* was factually distinguishable from the cases that established the threshold inquiry (*Balfour* and *Atlantic Mutual*), the Second Circuit "le[ft] for a more appropriate case the question of how [*Kirby*] might circumscribe our 'threshold inquiry' doctrine, if at all." *Id.* The Second Circuit followed the same logic in *ProShipLine, Inc. v. Aspen Infrastructures, Ltd.*, which similarly did not displace the threshold inquiry. 585 F.3d 105, 110 n.2 (2d Cir. 2009) ("This case is also readily distinguishable from our prior 'threshold inquiry' cases, so we need not examine [*Kirby*'s effect]."). Nearly a decade later, in *Fireman's Fund Insurance Co. v. Great American Insurance Co. of N.Y.*, the Second Circuit again noted the "uncertainty" that *Kirby* created concerning the threshold inquiry, but declined to "resolve that uncertainty." 822 F.3d at 634.

Two years after *Fireman's Fund*, in 2018, the Second Circuit appeared to change course in *d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.* by looking to the subject matter of a possibly maritime contract and "omit[ting] the 'threshold' inquiry altogether." *Starr Indem. & Liab. Co. v. Marine Env't Remediation Grp., LLC*, No. 17-cv-09881 (LGS), 2018 WL 3611970, at *3 (S.D.N.Y. July 27, 2018) (citing *d'Amico*, 886 F.3d 216). At least one court in this district concluded — from *d'Amico*'s omission and from the foregoing history — that the threshold inquiry "is inconsistent with *Kirby*" and declined to conduct it. *YS GM Marfin II LLC v. Four Wood Cap. Advisors, LLC*, No. 20-cv-03320 (PGG), 2023 WL 2713847, at *8 (S.D.N.Y. Mar. 30, 2023) (citation omitted). However, the Second Circuit has neither

expressly held that the threshold inquiry should be abandoned nor cabined its applicability to certain types of maritime cases, and several courts in this district have still conducted it despite the uncertainty.  *See, e.g.*, *XL Specialty Ins. Co. v. Prestige Fragrances, Inc.*, 420 F. Supp. 3d 172, 189 n.18 (S.D.N.Y. 2019) (noting threshold inquiry may be unnecessary but nevertheless conducting it); *Marine Env't*, 2018 WL 3611970, at *3 (similar); *Kulberg Fins. Inc. v. Spark Trading D.M.C.C.*, 628 F. Supp. 2d 510, 516 n.2 (S.D.N.Y. 2009) (similar); *A.P. Moller-Maersk A/S v. Ocean Express Mia.*, 550 F. Supp. 2d 454, 461 n.3 (S.D.N.Y. 2008) (similar).  Accordingly, and until the Second Circuit conclusively says otherwise, the Court will follow the two-step inquiry.

### A.  The Subject Matter of the Dispute

BNP frames this action as a "'garden variety' insurance coverage dispute," BNP Br. at 3, that "does not involve any commercial maritime activity in any way," because "BNP has never been involved in commercial maritime activity and no aspect of its claim against WQIS concerns commercial maritime activity," BNP Reply at 7.[1]  For its part, WQIS contends that this dispute concerns "marine pollution on a navigable waterway," WQIS Reply at 3, which "has the potential to not only disrupt maritime commerce on the Buffalo River and in an adjacent marina, but also in Lake Erie," WQIS Br. at 6.  Therefore, WQIS continues, the fact that *The Sullivans* is "moored and stationary is irrelevant to the question of admiralty jurisdiction."  WQIS Reply at 2.  The Court agrees with WQIS.

Both the Second Circuit and courts in this District have found that disputes like this one are sufficiently maritime because they implicate maritime commerce.  For example, in *Fireman's Fund*, the owner of a dry dock sought contribution from its insurer for

---

[1] BNP and WQIS's submissions do not have page numbers; as such, the Court will use the ECF-stamped page numbers for ease of reference.

"environmental cleanup costs" the owner incurred after the dock sank. 822 F.3d at 625-26.
The Second Circuit held that the matter cleared the threshold inquiry because "[t]he sinking of
the dry dock created potential dangers to public health and safety and the environment —
matters that would directly impact those who conducted maritime commerce in those waters."
*Id.* at 634. Similarly, in *Starr Indemnity & Liability Company v. Marine Environmental
Remediation Group, LLC*, the owner of a partially dismantled ship sought to recover losses
incurred when the vessel "sank and discharged approximately 1,800 gallons of waste oil" into
the water. 2018 WL 3611970, at *1. That court held that the dispute was sufficiently
maritime, inasmuch as it "stem[med] from an oil spill off the coast of Puerto Rico that
occurred when a vessel sank into the ocean, and the particular issue [wa]s whether an
insurance policy cover[ed] the resulting losses." *Id.* at *3. And in *Starr Indemnity & Liability
Company v. Water Quality Insurance Syndicate*, two oil barges ran aground, resulting in
salvage costs for the owner, who sought reimbursement under a pollution insurance policy
that he alleged covered the incident. 320 F. Supp. 3d 549, 552 (S.D.N.Y. 2018), *aff'd* 775 F.
App'x 4 (2d Cir. 2019) (summary order). That court found the dispute "turn[ed] on the
applicability of the [pollution insurance] policy to liability arising out of a marine incident on
a vital waterway for U.S. shipping," and concluded that it fell within federal admiralty
jurisdiction. *Id.* at 567. Applying the reasoning of these cases, the Court finds that BNP's
action concerns whether the Policy covers BNP's losses stemming from an oil spill on
navigable waters of the United States, namely the Buffalo River, which has the potential to
impact maritime commerce and is therefore sufficiently maritime.

BNP argues that *Water Quality* is inapt because the barges in that case were
"indisputably involved in 'maritime commerce,'" BNP Br. at 8, whereas *The Sullivans* is "a
tourist attraction and historical museum," *id.* at 3, and has been "docked and stationary" for

that purpose "for over 40 years," *id.* at 9.  But the cases discussed above do not require that the insured property was directly involved in maritime commercial activity.  In fact, in *Marine Environmental*, the vessel at issue was not involved in much activity at all, let alone commercial activity: it "was a 'dead ship' when the [p]olicy was signed," 2018 WL 3611970, at *2, and its owner had begun dismantling it in the months before it sank and spilled oil, *id.* at *1.  In *Fireman's Fund*, the Second Circuit noted that the dry dock at issue was "a structure used in vessel repair and maintenance," but its analysis of the nature of the dispute turned on the spill's potential impact on commerce.  822 F.3d at 634.  In *Water Quality*, too, the court's framing of the dispute centered on the potential damage to commerce, not the activities the barges were engaged in leading up to their grounding.  320 F. Supp. 3d at 567-68.  That other maritime disputes may feature parties directly engaged in commercial activities, *see* BNP Reply at 5-6 (collecting cases), does not mean that only those disputes fall within the Court's maritime jurisdiction.  *See d'Amico*, 886 F.3d at 226 ("Requiring a connection with a specific vessel is in tension with *Kirby*'s express instruction that the existence of maritime contract jurisdiction cannot be resolved by resort to questions like whether a vessel was involved in the dispute . . . .").

Therefore, the Court finds that if the threshold inquiry is still required, the subject matter of the parties' dispute satisfies it because the dispute is sufficiently maritime.

## B.  The Subject Matter of the Contract

Having found that the dispute is sufficiently maritime, the Court proceeds to the second step of the inquiry: the subject matter of the contract.

Because "an insurance contract is maritime to the extent that it is 'marine insurance,'" this second step of the Court's inquiry must focus on whether the Policy's "primary or principal objective . . . is the establishment of 'policies of marine insurance.'"  *Folksamerica*,

413 F.3d at 315 (first quoting *Jeffcott v. Aetna Ins. Co.*, 129 F.2d 582, 584 (2d Cir. 1942); and then quoting *Dunham*, 78 U.S. (11 Wall.) at 35); *accord Water Quality*, 320 F. Supp. 3d at 567. "[U]ltimately, coverage determines whether a policy is 'marine insurance,' and coverage is a function of the terms of the insurance contract and the nature of the business insured." *Fireman's Fund*, 822 F.3d at 632 (quoting *Folksamerica*, 413 F.3d at 317). In other words, the Court "must look to the risks the insurer assumed." *Folksamerica*, 413 F.3d at 317; *see Jeffcott*, 129 F.2d at 584 (finding insurance policy marine even where it "required the vessel to be laid up" because it covered risks "peculiar to ship and sea" that "[a] non-marine insurance company . . . would not be prepared to assume"). And where the insurer assumes risks related to pollution, the "coverage is widely recognized as marine in nature." *Folksamerica*, 413 F.3d at 321 (first citing *Youell v. Exxon Corp.*, 48 F.3d 105, 107 (2d Cir. 1995), *vacated on other grounds*, 516 U.S. 801 (1995); then citing *Youell*, 48 F.3d at 109; and then citing *M/G Transp. Servs., Inc. v. Water Quality Ins. Syndicate*, 234 F.3d 974, 975-76 (6th Cir. 2000)).

Here, the Policy provides pollution coverage: it provides, among other things, that WQIS will indemnify BNP for costs BNP incurs in connection with oil spills from *The Sullivans* that violate certain federal laws, or otherwise "aris[e] out of the sudden, accidental and unintentional discharge . . . of any substance of any kind into or upon the Navigable Waters, the adjoining shorelines or the Exclusive Economic Zone." Dkt. 1-2 at 4. The Policy's coverage includes indemnification for costs related to BNP's investigation of the spills, fines and penalties imposed on BNP as a result of the spills, public-relations efforts BNP takes during remediation of the spills, and BNP's mitigation of the spills. *Id.* at 4-6. This coverage fits within the scope of a marine, and therefore maritime, insurance contract. Indeed, the Second Circuit has routinely held that the primary objective of policies providing

pollution coverage is maritime. *See, e.g.*, *Fireman's Fund*, 822 F.3d at 637 (finding primary objective of pollution coverage of dry dock was "marine in nature" where it "insure[d] against the risk of liability for pollutants emitted during [owner]'s ship repair and maintenance operations there"); *Folksamerica*, 413 F.3d at 321 (finding pollution coverage in shipowner insurance policy "marine in nature"); *Youell*, 48 F.3d at 107 (describing coverage for "fines and penalties for pollution" in shipowner insurance policy as "marine liabilities"). In fact, as WQIS argues, the court in *Water Quality* reviewed an identically worded WQIS pollution liability policy, found that its "primary objective . . . [wa]s to insure against the risk of pollutants emitted from" the covered vessel, and held that it was a maritime insurance contract. *Water Quality*, 2018 WL 3611970, at *2; *see* WQIS Br. at 4-5.

The cases BNP cites in arguing that the Policy is not maritime are inapposite, as they do not involve insurance contracts, let alone insurance contracts offering pollution coverage. *See* BNP Reply at 3-4. Rather, those cases concern contracts for the purchase and sale of commodities that tangentially related to maritime shipment. *See Jakil, S.P.A. v. Agrimpex Co.*, No. 08-cv-05613 (DC), 2009 WL 57479, at *3 (S.D.N.Y. Jan. 8, 2009) (holding that contracts for purchase and sale of grain were not maritime where contracts required seller "to deliver the grain via a maritime vessel" but contemplated that seller would do so by "enter[ing] into a separate charter party with a third-party vessel owner"); *EFKO Food Ingredients Ltd. v. Pac. Inter-Link SDN BHD*, 582 F. Supp. 2d 466, 467, 471 (S.D.N.Y. 2008) (holding that contracts for purchase and sale of palm olein were not maritime where seller's "responsibility to arrange for [maritime] shipment [wa]s only incidental to the sale and purchase contract as a whole"). Those contracts required a different analysis than that required here, and as a result those cases do not support BNP's position that the Policy is not

maritime, or its conclusion that this action "is a typical insurance coverage dispute governed by New York law," BNP Reply at 3.

Therefore, the Court finds that the subject matter of the Policy is maritime. And because the Court has found that the subject matter of both the parties' dispute and contract are maritime, the Court finds that it has maritime jurisdiction over BNP's action.

## II.    The Policy's Forum-Selection Clause

The Court turns next to the Policy's forum-selection clause. The Court, in exercising maritime jurisdiction, "acts as a federal common law court" and applies federal maritime law to its interpretation of the Policy. *AGCS Marine Ins. Co. v. M/V IMABARI LOGGER*, No. 22-cv-09283 (LGS), 2024 WL 4345727, at *3 (S.D.N.Y. Sept. 30, 2024) (quoting *Great Lakes Ins. SE v. Raiders Retreat Realty Co.*, 144 S. Ct. 637, 642 (2024)). Under that law, "the correct doctrine to be followed by federal district courts sitting in admiralty" is to enforce forum-selection clauses as "prima facie valid . . . unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances," or unless the resisting party can "clearly show that . . . the clause [i]s invalid for such reasons as fraud or overreaching." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 15 (1972); *see Raiders*, 144 S. Ct. at 643 (endorsing *Bremen* and extending its holding to choice-of-law clauses). Accordingly, "where one party has shown an apparently governing forum selection clause, the party opposing litigation in the so designated forum must make a strong showing to defeat that contractual commitment." *Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 822 (2d Cir. 2006); *see also New Moon Shipping Co. v. MAN B&W Diesel AG*, 121 F.3d 24, 29 (2d Cir. 1997) (explaining that analyzing "the validity and enforceability of a forum selection clause" requires "substantial deference to the parties' selected forum").

10

BNP has not made that strong showing.  Crucially, BNP does not argue that the Policy's forum-selection clause was the result of fraud or overreach.  Nor does BNP cite any particular hardship or injustice it will be compelled to bear if the Court enforces the clause. Instead, BNP's sole argument is that enforcing the clause "would be unreasonable and unjust" because it would force BNP "to litigate its claims in a forum without jurisdiction over this dispute." BNP Br. at 6.  The Court's holding that it has maritime jurisdiction over this matter disposes of that argument.

In short, because BNP is the party resisting application of the forum-selection clause and has provided no reason to disturb its *prima facie* validity, the Court will enforce it.

## CONCLUSION

For the foregoing reasons, the Court finds that it has maritime jurisdiction over the parties' action and that the forum-selection clause in the parties' insurance contract is enforceable.  Thus, venue is proper in the Southern District of New York.

In light of the Court's decision, WQIS is directed to answer or otherwise respond to BNP's complaint within twenty-one days of this Opinion and Order.

Dated:  September 23, 2025
        New York, New York

                                        SO ORDERED.


                                        JENNIFER L. ROCHON
                                        United States District Judge